Kevin Sharp (TN Bar No. 016287, *pro hac vice* forthcoming)
ksharp@sanfordheisler.com
Cara Van Dorn (California State Bar No. 321669)
cvandorn@sanfordheisler.com
**Sanford Heisler Sharp McKnight, LLP**
7911 Herschel Avenue, Suite 300
La Jolla, CA 92037
Telephone: (619) 327-9832
Facsimile: (619) 577-4250

*Attorneys for Victims Jane Does Nos. 1-22*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL JAMES PRATT (1),<br><br>Defendant. | Case No.: 3:19-CR-04488-JLS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF VICTIMS' OPPOSITION TO UNITED STATES' UNOPPOSED MOTION REGARDING RESTITUTION** |

Victims Jane Does Nos. 1-22[1] (the "Jane Does"), by and through undersigned counsel, respectfully submit the following Points and Authorities in support of their Opposition to the United States' Unopposed Motion Regarding Restitution (ECF No. 491). The Jane Does oppose the Unopposed Motion to the extent the Government recommends distribution to all victims on a *pro rata* basis. For the reasons stated below, the Jane Does respectfully request that the Court grant them priority in the distribution of restitution in the above captioned action pursuant to 18 U.S.C. § 3664(i).

---

[1] Jane Does Nos. 1-22 are Victims 50, 65, 30, 58, 23, 8, 34, 38, 13, 19, 78, 74, 46, 12, 48, 51, 5, 77, 79, 73, 15, 66, respectively.

1

## I.  INTRODUCTION

The Jane Does became victims of Defendant Michael Pratt's ("Pratt") sex trafficking scheme known as GirlsDoPorn from 2014 to 2017. Starting in or around 2015, when their own efforts to obtain relief failed, the Jane Does retained attorneys to represent them in securing the rights to their videos, obtaining compensation for their injuries, and stopping Pratt and his co-conspirators from continuing to victimize other women. Because Pratt refused to engage in any negotiation, the Jane Does filed the first of three consolidated lawsuits against Pratt, *et al.* in June 2016, alleging claims of fraud, misappropriation of likeness, and deceptive business practices in San Diego Superior Court (the "Civil Action").[2]

The Jane Does and their Counsel spent the next three years, thousands of hours, and hundreds of thousands of dollars investigating and pursuing Pratt and the GirlsDoPorn criminal enterprise. Pratt, his co-conspirators, and attorneys viciously harassed the Jane Does in retaliation for bringing the Civil Action, both in the litigation and on the internet. In the face of these attacks, the Jane Does persisted. Through an extensive, privately funded investigation, the Jane Does uncovered vital evidence, which they shared with the U.S. Department of Justice, and which assisted the Government in investigating and prosecuting Pratt and his co-conspirators. About two months after the start of the trial in the Civil Action, the Government indicted Pratt and his co-conspirators in November 2019. In January 2020, the state court issued a 186-page Statement of Decision finding that Pratt and his co-conspirators defrauded the Jane Does, making detailed factual findings as to each Jane Doe, and finding Pratt liable for more than $12 million in damages.[3]

---

[2] *Jane Does Nos. 1-22 v. GirlsDoPorn.com, et al.*, San Diego Superior Court Case Nos. 37-2016-00019027-CU-FR-CTL, 37-2017-00033321-CU-FR-CTL, 37-2017-00043712-CU-FR-CTL.

[3] A true and correct copy of the final Statement of Decision, issued April 27, 2020 ("Decision"), is attached as Exhibit AA to the Declaration of Cara Van Dorn.

Despite years of effort, severe harassment, and repeatedly reliving their trauma during the litigation of the Civil Action, the Jane Does have collected only a minute fraction of their judgment. Because all members of the conspiracy are incarcerated and all assets have been seized by the Government, the restitution process is the only avenue through which the Jane Does have any chance of receiving compensation for the immense harm Pratt and his criminal enterprise have caused. To avoid gross injustice, the Jane Does now respectfully request priority in the distribution of the limited restitution funds to ensure they receive some compensation for the harm they sustained through the investigation, litigation, and trial of the Civil Action, which assisted the Government in bringing down Pratt and the GirlsDoPorn criminal enterprise, and thus redounded to the benefit of all victims of the enterprise.

## II.  STATEMENT OF THE CASE

On June 5, 2025, Pratt pled guilty to conspiracy to commit sex trafficking by force, fraud or coercion, in violation of 18 U.S.C. § 1594, and one substantive count of sex trafficking, in violation of 18 U.S.C. § 1591. As part of the plea, Pratt agreed to pay restitution in an amount determined by the court. ECF No. 450.

On September 8, 2025, this Court sentenced Pratt and set a restitution hearing for November 7, 2025, which it continued to December 19, 2025. On November 18, 2025, the Court vacated the restitution hearing date in its Criminal Forfeiture order. ECF No. 478.

On December 12, 2025, the Government filed its Unopposed Motion Regarding Restitution, which states that Pratt "agrees to pay restitution in the total amount of $75,129,939.71, which includes gross income and certain victims' specific losses." ECF No. 491, at 3. While not addressed in its Unopposed Motion, the Government's proposed order states restitution funds will be distributed among all of Pratt's more than 500 victims on a *pro rata* basis. The Jane Does oppose the Government's Unopposed Motion to the extent that it recommends *pro rata* distribution of restitution funds and hereby request that the Court grant them priority in the distribution of restitution.

### III. FACTUAL BACKGROUND

#### A. The Jane Does retained counsel and filed a lawsuit because there was no other way to stop Pratt and GirlsDoPorn.

The Jane Does retained counsel and filed the Civil Action because their prior efforts to remove their videos from the internet and stop Pratt and his co-conspirators from defrauding more women had proven futile. For example, as the court in the Civil Action found:

- Jane Doe 1 [Victim 50] called Garcia and Wolfe, but received no response, so she "sent an email to an address she found on the GirlsDoPorn website (Ex. 47), but this time she received a response—a cease and desist letter from Panakos Law [Pratt's attorney] threatening to seek a restraining order. (Ex. 49.)" Decision, at 45-46.

- Jane Doe 4 [Victim 58] sent an email to GirlsDoPorn begging them to take down her videos, saying "I never authorized it to be put online. I was told it would be sent to a DVD in Australia only," and asking for her contract. In this email, Jane Doe 4 described the harassment she endured and her desperation. She even threatened legal action, but she never received a response. *Id.* at 53.

- Jane Doe 5 [Victim 23] "asked Pratt via text for a copy of her documents, and, rather than complying, Pratt asked, 'Whats the deal your trying to fuck us over or something?' [sic] and never sent her the documents." *Id.* at 56.

- Jane Doe 6 [Victim 8] "contacted the email address listed on GirlsDoPorn.com, begging them to remove the video and offering to purchase the rights because she was lied to, and the video was ruining her life to the point of being suicidal. The responses she received were vague, taunting, and unhelpful." *Id.* at 59.

- Jane Doe 7 [Victim 34] attempted to call Wolfe and email the company but received no response. *Id.* at 62.

- Jane Doe 8 [Victim 38] sent take-down requests in an effort to remove her video from the internet, but the agency responded that the owners of the website would not remove the video because she did not have the rights to it. *Id.* at 66.
- Jane Doe 9 [Victim 13] called Wolfe repeatedly until he blocked her number, and she tried to find contact information for the company online but could not. *Id.* at 69.
- Jane Doe 11 [Victim 78] offered to return the money Pratt paid her if he would take down her video, but he refused. She hired another attorney, who wrote a detailed demand letter, but Pratt only agreed to remove the video in exchange for $15,000, and she did not trust him to hold up his end of the deal if she paid. *Id.* at 76-77.
- "In an attempt to stop other girls from falling for the same lie she fell into, Jane Doe 17 [Victim 5] began posting on Craigslist to explain that the Defendants' photo shoots will actually end up being pornography shoots. . . . In response to her postings on Craigslist, Defendants—through their counsel, Aaron Sadock—sent Jane Doe 17 [Victim 5] a cease and desist letter that included her nude photos threatening her with a lawsuit if she continued making the posts. The letter was addressed to her parents' house." *Id.* at 98.
- Jane Doe 19 [Victim 79] tried calling Pratt, but he pretended not to know who she was and hung up on her. When she tried again, he did not answer. When she texted him that she would get a lawyer, he responded "LOL" and "your [sic] a joke." *Id.* at 106.
- At least two of the Jane Does, Nos. 1 and 17 [Victims 50 and 5], reported Pratt and his co-conspirators to the San Diego Police Department. In November 2015,

attorney John O'Brien spoke with a detective in the San Diego Police Department. Nothing came of these reports. (O'Brien Decl.[4] ¶¶ 8-10.)

Because Pratt refused to remove the Jane Does' videos or stop his sex trafficking scheme—and because the Government did not take action until October 2019—the Jane Does were forced to retain Counsel, file the Civil Action, litigate for years, and bring the case all the way to trial. Several Jane Does testified at trial that preventing Pratt from continuing to victimize other women was a primary goal of their decision to bring the Civil Action:

> Jane Doe No. 17 [Victim 5] testified:
>
> Q: Why did you decide to become a part of this lawsuit?
>
> A: To put a stop to these guys so girls don't fall victim to this anymore; to get my video taken down; to just move on and put this past me. I just don't want this to happen to anyone else. So that was the main reason.

(09/03/2019 Trial Tr. 39:11-17.) […]

> Jane Doe No. 15 [Victim 48] testified:
>
> Q: Why did you bring this lawsuit?
>
> A: …I knew that I was lied to, and after this experience, I just never felt more worthless, and I just didn't want that to happen to any other girls.

(8/26/2019 Trial Tr. 34:22-25.)

> Jane Doe No. 12 [Victim 74] testified:
>
> Q: Why did you file this case?
>
> A: I filed it because I felt wronged and lied to. I felt that my life was absolutely ruined and flipped upside down and backwards because of being lied to essentially, and I just don't want this to happen to any

---

[4] The Declaration of John J. O'Brien is attached as Exhibit BB to the Declaration of Cara Van Dorn. For simplicity, Mr. O'Brien's declaration will be referred to as "O'Brien Decl." herein.

> other girl. I don't want any other girl to go through any of this. It's terrible.

(8/22/2019 Trial Tr. 94:7-13.)

Jane Doe No. 13 [Victim 46] testified:

> Q: Why did you file this lawsuit, or become part of it, I should say?
>
> A: Well, at the time, I was, you know, trying to – I was at the lowest part of my life, so it couldn't get worse from there for me. I felt that I had to take everything in me to fight back and regain, you know, my voice and my image and protect myself from how I was wronged. And then when I realized this was happening to so many other girls, I couldn't – I couldn't sit back and watch it happen because, God forbid, that happened to my daughter or my best friend. I needed to right the wrongs that was done.

(09/09/2019 Trial Tr. 95:21-96:8.)

(O'Brien Decl. ¶ 68 [quoting several Jane Does' trial testimony].)

### B. **Pratt and his co-conspirators mercilessly harassed the Jane Does for bringing the Civil Action.**

The Jane Does retained Counsel in 2016 and filed the first complaint in the Civil Action in June 2016. More than three years later, the case finally went to trial in August 2019. Being part of the Civil Action put the Jane Does on the front lines. They not only had to repeatedly relive the trauma of being sex trafficked in order to litigate the Civil Action, but they became targets for harassment and retaliation from Pratt, his attorneys and co-conspirators, and many others. The Jane Does themselves spent hundreds of hours litigating the Civil Action for which they have not been (and likely never will be) compensated.

The Jane Does were forced to repeatedly rehash the trauma of their experience of being sex trafficked—for many, the most traumatic event of their lives—in order to build their case, respond to discovery requests, prepare for and endure their depositions, and prepare for and endure testifying at trial. Instead of deleting and attempting to ignore

incidents of harassment, the Jane Does had to preserve evidence of those incidents, produce the evidence to their attorneys, and then revisit the evidence in depositions and at trial. All the Jane Does were deposed at least once. Seventeen of the Jane Does testified live at trial (including many flying to San Diego from out of state), while five testified via video deposition.

Pratt and his co-defendants abused the discovery and litigation process in the Civil Action to inflict maximum pain on the Jane Does. Pratt requested irrelevant and highly sensitive information, such as "all titillating pictures" the Jane Does had ever taken, information about their sexual histories, and their OBGYN records. (O'Brien Decl. ¶¶ 28-30.) Pratt and his attorneys sought to humiliate and intimidate the Jane Does by repeatedly attempting to reveal their real names and seeking irrelevant private information and medical records. (*See, e.g.,* Holm Decl. ¶¶ 17, 25, 30.) Pratt and his co-defendants used extraordinarily aggressive, obstructive, and cruel litigation tactics to maximize the cost and pain of the case for the Jane Does.

Pratt's attorneys used the depositions to delve into private, humiliating information with no relevance in their questioning, including asking one Jane Doe under oath to compare Defendant Garcia's penis size to her ex-boyfriend's penis, then pressing for the boyfriend's real name. (Holm Decl.[5] ¶ 43, Deposition of Jane Doe No. 3 [Victim 30] Vol. 1 at 252:23-253:8.) In several Jane Does' depositions, Pratt's attorneys insisted on playing her pornographic video, pausing it at intervals where the Jane Does were nude, mid-intercourse, and in revealing positions to ask absurd questions about what she was thinking or what happened next in the video. (O'Brien Decl. ¶ 34.) For example:

---

[5] The Declaration of Brian M. Holm is attached as Exhibit CC to the Declaration of Cara Van Dorn. For simplicity, Mr. Holm's declaration will be referred to as "Holm Decl." herein.

> BY MR. SADOCK: Q. So the cut is at 3029. The cut from the scene we were watching, oral sex scene one to behind the scene one. Do you recall this cut scene? Is there anything in this image that helps you recall?...
>
> Q. You don't need to watch it. I'm asking a question. Did you tell Dre at any point that you did not want him cumming on you?

(O'Brien Decl. ¶ 34; Holm Decl. ¶ 31, Deposition of Jane Doe No. 4 [Victim 58] at 223:12-15; 252:5-8.)

> Q. MR SADOCK: This is the first break I've seen. Does this match your memory of the first break, in your memory, in terms of after you started having intercourse? Does this remind you of your first break or no?
>
> A. It could be. We stopped a lot because of like me freaking out, but...

(O'Brien Decl. ¶ 34; Holm Decl. ¶ 31, Deposition of Jane Doe No. 14 [Victim 12] at 256:16-22.)

The Jane Does experienced increased harassment as a result of bringing the Civil Action.[6] The media heavily covered the Civil Action, including the trial. While most members of the press covered the story without attempting to identify the Jane Does by name, the trolls on the internet did the opposite. Numerous websites devoted to identifying and doxxing GirlsDoPorn victims focused heavily on the Jane Does. Multiple websites show trolls sharing copies of the complaints and other filings, identifying the Jane Does by name and episode number, and laughing at them. After their names and contact information were revealed online as the plaintiffs suing GirlsDoPorn, the Jane Does received countless direct messages, texts, phone calls, and other forms of harassment. During the trial, many Jane Does received phone calls from someone pretending to be a reporter.

The state court found that Pratt and his co-defendants retaliated against the Jane Does for pursuing legal action against them. The Decision contains the following relevant findings:

---

[6] The Jane Does can provide countless examples of this harassment but have refrained from doing so at this time to avoid overburdening the court. Some examples are cited in the Statement of Decision, and further evidence can be provided upon request.

      Shortly after Jane Doe 1 [Victim 50] retained counsel in an effort to obtain a copy of the documents she signed and get her videos removed from the internet, the Court finds Defendants leveled significant harassment against her. Jane Doe 1's [Victim 50] GDP sex video was suddenly and immediately sent to dozens of students, professors, and administrators at her law school. (Exs. 60, 63, 90 - 92, 97.)

      While Defendants deny they had anything to do with this harassment, the record indicates that it is more likely than not that they were behind the harassment. Shortly after Jane Doe 1 [Victim 50] contacted Defendants, an article appeared on a popular gossip website, which focused on the fact that she was a law student and maliciously impugned her character and intelligence. (Ex. 77.) This article contains one telltale detail suggesting that Defendants are behind it—the unfounded accusation that Jane Doe 1 [Victim 50] "escorts in Vegas over the summer." (*Id.*) Jane Doe 1 [Victim 50] testified that this is something Garcia asked her to say during the interview prior to her video but she refused and said she was a hotel receptionist. (Trial Tr. 09/11/19 at 191: 16 - 192:11). She said that no one had ever accused her of such a thing before and that she believed the comment in the article could only have come from Garcia or Wolfe. (Trial Tr. 09/11/19 at 236:1 - 11.)

      The Court finds that Pratt, disguised as "Taylor Ann Fairchild," personally took action to spread Jane Doe 1's [Victim 50] video to important people in her life, including her employer (Ex. 99), her college soccer coach (Ex. 115), and her sister (Ex. 97). The same Ann Fairchild account also contacted Jane Doe 21's [Victim 15] mother revealing the video. (Ex. 963.)

Decision, at 41-42.

Pratt's employee, Alexander Foster, pleaded guilty to stalking the Jane Does by working on a video called "22 Whores + 5 Shady Lawyers VS GirlsDoPorn," which he admitted "was intended to intimidate the plaintiffs [the Jane Does] and retaliate against them for bringing a legal action against Pratt and Wolfe by identifying them in a very public manner." Foster Plea Agreement, Case 3:23-cr-00111-JLS, ECF No. 6, pp. 4-5. Foster "further admit[ed] that the intended release of the video was a part of a larger effort by Pratt and Wolfe to harass the plaintiffs over the internet." *Id.* at p. 5.

### C. The Jane Does produced valuable evidence to the Government to assist with the investigation and prosecution of Pratt and GirlsDoPorn.

Through their private investigation and pursuit of civil claims, the Jane Does uncovered valuable evidence, which they shared with the FBI starting in or around late 2017. Over the course of the next two years, the Jane Does provided *all evidence* gathered by the Jane Does and their Counsel, experts, investigators, and third party witnesses that was not subject to a protective order. This included, *inter alia*:

- All evidence gathered from the Jane Does, which included critical text messages showing a reference model lying to one of the Jane Does, which was referenced in at least one plea agreement, *see, e.g.,* Garcia Plea Agreement, ECF No. 149, at pp. 7-8;
- Deposition and trial transcripts of the Jane Does, third party victims, reference models, and former employees of Pratt, including Alicia McKay, Kaylin Wright, Alex Martinez, Teddy Gyi, Doug Wiederhold, and Valorie Moser;
- Investigative reports into Pratt, his entities, co-conspirators, and other associates generated by the Jane Does' cyber security expert, linking Pratt to an online alias he used to harass the Jane Does, among other critical breakthroughs;
- Documentary evidence gathered from third party victims and reference models;
- Investigative reports generated by the Jane Does' financial investigator into Pratt, his entities, co-conspirators, and other associates, which linked Pratt to several offshore entities, among other important evidence; and
- The license plate numbers for cars owned by Pratt's companies.

The Jane Does' Counsel personally travelled across the country and abroad to obtain critical documentary evidence linking Pratt to several offshore entities and establishing the elements of the case, which he produced to the Government. (Holm Decl. ¶ 28.) All of this occurred *before* the Government filed its criminal complaint in October 2019—approximately two months into the trial of the Civil Action.

The Jane Does gathered evidence in their investigation and litigation of the Civil Action, which they provided to the Government to assist with investigating and prosecuting Pratt and his co-conspirators. The 186-page Statement of Decision finding Pratt and his co-defendants defrauded the Jane Does, which contained detailed findings of fact, has been used by the Government throughout the prosecution of the criminal case. The Government even quoted from the Statement of Decision in Pratt's sentencing hearing to show that Pratt personally engaged in harassment of the Jane Does.

### D. **The Jane Does prevailed in the Civil Action but have not been compensated for their losses.**

The Civil Action finally reached trial in August 2019 and lasted 99 days. The parties examined 38 live witnesses, presented deposition testimony from 13 other witnesses, and admitted 1,218 exhibits. Twenty-two motions required briefing. (Holm Decl. ¶ 47; O'Brien Decl. ¶ 52.)

In January 2020, the state court found in favor of the Jane Does on all claims, including fraud, concealment, false promise, misappropriation of likeness (both statutory and common law), and deceptive business practices in violation of California Business and Professions Code § 17200. The court made detailed, individualized findings as to each of the Jane Does, *see* Decision, at 44-115, and awarded them $12,775,831.40 in damages, including $1,025,831.40 in economic damages (i.e., the stipulated amount of Pratt's profits from the use of the Jane Does' videos; $46,628.70 for each of the Jane Does), $8,450,000 in noneconomic damages (each Jane Doe was awarded $250,000, $400,000, or $500,000, based on the evidence), and $3,300,000 in punitive damages (i.e., $150,000 each), *see id.* at 182-186. The state court found Pratt and all defendants were part of a joint venture, alter egos of each other, and jointly and severally liable for all damages. *Id.* at 175-179, 186. The court gave the Jane Does all rights to their videos and permanently enjoined Pratt and his co-defendants from continuing their fraudulent business practices. *Id.* The state court later awarded the Jane Does $7,839,265 in attorneys' fees and $781,380 in costs.

The Jane Does have collected only a small fraction of the more than $21 million Pratt and his co-defendants owe to them. Through the bankruptcy of Domi Publications, LLC, one of the businesses Pratt used to carry out the sex trafficking venture, the Jane Does received only $669, $782, or $1,044 for injuries for which restitution is recoverable.[7]

### E. Distribution of restitution on a *pro rata* basis would be unjust in light of the Jane Does' injuries and efforts in bringing the Civil Action.

Restitution is likely the Jane Does' last and only chance to obtain meaningful relief for the harm they suffered as a result of Pratt's unlawful conduct and their participation in the Civil Action. The government has seized all assets of value, and Wolfe and Garcia will be in prison for the next 8 and 14 years, respectively, and all of the entities that are jointly and severally liable for the Jane Does' judgment are now defunct and have no assets.

The Government has identified approximately 570 victims of Pratt's GirlsDoPorn sex trafficking scheme. The Government's Unopposed Motion seeks more than $75 million in restitution for those victims: approximately $17 million in gross income from the GirlsDoPorn scheme, to be distributed among all victims on a *pro rata* basis, and $58 million for specified losses of 106 victims, as listed in the proposed order. The Jane Does requested—and Pratt agreed to pay—a total of $8,613,583.33 in restitution, which includes $653,160.63 for the Jane Does' share of the gross income from the scheme, as well as

---

[7] Each of the Jane Does received $10,000, but only a fraction of this is attributable to economic damages, which is the only portion that is also recoverable as restitution from Pratt. Based on a *pro rata* distribution of the recovered funds among the categories of damages awarded in the Civil Action, Jane Does Nos. 5, 7, 8, 10, 18, 21, and 22 [Victims 23, 34, 38, 19, 77, 15, and 66] received $1,044 for economic damages, $5,597 for noneconomic damages, and $3,358 for punitive damages; Jane Does Nos. 2, 3, 4, 9, 13, 16, 19, and 20 [Victims 65, 30, 58, 13, 46, 51, 79, and 73] received $782 for economic damages, $6,704 for noneconomic damages, and $2,514 for punitive damages; and Jane Does Nos. 1, 6, 11, 12, 14, 15, and 17 [Victims 50, 8, 78, 74, 12, 48, and 5] received $669 for economic damages, $7,177 for noneconomic damages, and $2,153 for punitive damages.

$7,960,422.71 for the Jane Does' specified victim losses, such as medical expenses, lost income, and costs associated with removing their videos from various websites.

Based on the Court's Order of Criminal Asset Forfeiture (ECF No. 478), the only assets of any substantial value available to fulfill the restitution order are roughly 4.355 Bitcoin, which is worth around $380,000 at the time of this filing. If the Court signs the Government's proposed order, which provides for distribution among the victims on a *pro rata* basis, the Jane Does will only receive approximately $42,000 total—an average of approximately $1,945 for each Jane Doe. Such an outcome would be manifestly unjust in light of the magnitude and type of the losses the Jane Does endured as a result of bringing the Civil Action—a years-long effort that assisted the Government in stopping Pratt and his co-conspirators from continuing to sex traffic other women, and which thus benefitted all other victims.

To avoid this unjust result, the Jane Does respectfully request that the Court issue an order that grants them priority in the distribution of restitution funds. The Jane Does propose that the Court order that half (50%) of the funds available to pay restitution in this case be used to satisfy the Jane Does' restitution requests and half (50%) be used to satisfy the requests of the other victims who benefitted from the Jane Does' efforts in bravely litigating the Civil Action.

### IV. LEGAL ARGUMENT

Crime victims have "[t]he right to full and timely restitution as provided in law," 18 U.S.C. § 3771(a)(6), and may file a motion asserting that right in the district court where the defendant is being prosecuted for the crime. 18 U.S.C. § 3771(d)(3).

"District courts routinely exercise wide discretion both in sentencing as a general matter and more specifically in fashioning restitution orders." *Paroline v. United States*, 572 U.S. 434, 462 (2014); *see also* 18 U.S.C. § 3664(a). Federal law "gives sentencing courts significant flexibility to tailor restitution orders to particular circumstances." *U.S. v. Perry*, 360 F.3d 519, 535 (6th Cir. 2004).

District courts' discretion and flexibility in fashioning restitution orders specifically includes giving some victims priority over others "based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim." 18 U.S.C. § 3664(i). "It is clear that district courts have the authority to direct that restitution payments be made to the victims of an offense in a manner other than pro rata." *U.S. v. O'Connor*, 321 F. Supp. 2d 722, 731 n.23 (E.D. Va. 2004). Indeed, 18 U.S.C. § 3664(i) states, in relevant part:

> If the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim.

18 U.S.C. § 3664(i).

"[P]ro rata distribution is accepted as 'simply one alternative a court might adopt under the highly general and flexible grants of authority in 18 U.S.C. §§ 3664(f)(3)(A) and (i)." *U.S. v. Newcomb*, No. 6:14-CR-00001-1, 2015 WL 4878940, at *2 (W.D. Va. Aug. 14, 2015) (quoting *Perry*, 360 F.3d at 536). In *Newcomb*, the court granted priority in its restitution order to one victim of the crime, a financial institution called Northern Piedmont, over another victim financial institution, NCUA, based on each victim's unique circumstances and the equities at play. *Id.* at *3.

> The operation of the NCUA is not affected one way or the other, but establishing that Northern Piedmont's restitution claim takes priority may help resolve an impending threat to Northern Piedmont's survival. Therefore, I find that the equities here favor Northern Piedmont, as its economic circumstances will be significantly aided by the recovery of these funds.

*Id.*

In civil enforcement actions, courts have also prioritized the distribution of restitution funds to certain victims based on a weighing of the equities, including in one situation whose facts are similar to the facts presented here. In *Gonzalez v. Axess Trade Co.*, a group of investors sued Axess Trade for defrauding them, and the Commodity Futures Trading Commission ("CFTC") brought an enforcement action after learning

about the fraud through the investors' private action. No. 04 CIV. 3762 (RCC), 2005 WL 1384019, at *1 (S.D.N.Y. June 9, 2005). The court held that the group of investors

> deserve preference in distribution because their suit alerted the CFTC to Axess Trade's malfeasance and aided the CFTC in locating Axess Trade's assets . . . [whereas] the other victims have never appeared in either proceeding . . . and most important, the Private Plaintiffs have expended considerable time, effort, and monetary resources in pursuing their suit.

*Id.* at *5.

Although courts generally favor *pro rata* distribution where "the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders," *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-89 (2d Cir. 2002), "that proposition has softened impact when some victims expend their own resources and are responsible for bringing a defendant's wrongdoing to light." *Gonzalez*, 2005 WL 1384019, at *5. "Congress has recognized, for example, that private parties who bring actions that alert the government to false claims should receive compensation for their efforts." *Id.* (citing False Claims Act, 31 U.S.C. § 3730(d)).

Similarly, "courts have long recognized in the class-action setting an equitable principle that those whose efforts provide gain to others should be rewarded through the payment of attorney's fees and costs." *Id.* In *Boeing Co. v. Van Gemert*, the Supreme Court explained that the common-fund doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigants' expense." 444 U.S. 472, 478 (1980).

Here, the equities strongly favor granting priority to the Jane Does. They took steps that other victims did not—retaining attorneys, extensively investigating, and bravely litigating the Civil Action for more than three years because they had no other avenue to stop Pratt from continuing to harm them and other women. The Jane Does endured severe harassment from Pratt, his co-conspirators and attorneys, as well as trolls on the internet for bringing the Civil Action. They experienced reputational harm that is difficult to quantify and is unlikely to ever be remedied. The Jane Does devoted untold hours to

asserting their rights in the Civil Action, for which they have not been and are unlikely to ever be compensated.

The Jane Does assisted the Government in investigating and prosecuting Pratt and his co-conspirators by providing massive amounts of evidence gathered in their investigation and civil litigation, including hundreds of documents, thousands of pages of transcripts, investigative reports, videos, and other evidence gathered from dozens of witnesses and investigators around the country and abroad.

Unlike other victims, after a 99-day trial with dozens of witnesses and hundreds of exhibits, the Jane Does proved that Pratt defrauded them by a preponderance of the evidence. The California Superior Court made extensive factual findings as to Pratt's actions, the fraud committed with respect to each Jane Doe, and the injuries they suffered. The Jane Does' efforts and success in the Civil Action benefited all of Pratt's victims. If the Court orders distribution for the victims on a *pro rata* basis, the Jane Does will receive an average of less than $2,000 each—an outcome that would be unjust in light of the losses the Jane Does endured during their a years-long battle to stop Pratt and his co-conspirators from perpetuating his sex trafficking scheme, which redounded to the benefit of all Pratt's victims.

Taking into account the type and amount of the Jane Does' losses, the Court should give the Jane Does priority in the distribution of restitution, as permitted under 18 U.S.C. § 3664(i).

## V.   **CONCLUSION**

The Court should exercise its considerable discretion in fashioning restitution orders to give the Jane Does priority in the distribution of restitution, based on the losses they endured as a result of their efforts investigating and litigating the Civil Action. Allocating 50% of the limited restitution funds to satisfying the Jane Does' restitution requests and 50% to the other victims would properly take into consideration the Jane Does' losses, as well as the benefit their efforts provided to the other victims of GirlsDoPorn.

Dated: December 16, 2025

Respectfully submitted,

SANFORD HEISLER SHARP MCKNIGHT, LLP

By: *s/ Cara W. Van Dorn*
 CARA W. VAN DORN
 cvandorn@sanfordheisler.com
 Kevin Sharp (*pro hac vice* forthcoming)
 ksharp@sanfordheisler.com
 Attorneys for Victims Jane Does Nos. 1-22